UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
KATE ROBERTS,                 )
             Plaintiff,       )
                              )
             v.               )
                              )
MICHAEL J. ASTRUE,            )    CIVIL ACTION NO. 10-10664-PBS
                              )
             Commissioner of  )
             Social Security, )
                              )
             Defendant.       )
_____)

**MEMORANDUM AND ORDER**

July 27, 2011

SARIS, U.S.D.J.

**I.  INTRODUCTION**

Plaintiff, Kate Roberts, who suffers from various mental ailments, seeks review under 42 U.S.C. § 405(g) of the decision denying her application for Social Security Disability Insurance and Supplemental Security Income benefits on grounds that: (1) the Administrative Law Judge ("ALJ") did not properly consider the opinion of plaintiff's treating therapist; (2) the ALJ's residual functional capacity ("RFC") assessment was not supported by substantial evidence in the record; and (3) the ALJ improperly considered plaintiff's collection of unemployment benefits in assessing her credibility.  After reviewing the record, the Court **ALLOWS** defendant's motion for order affirming the decision of the

## II. PROCEDURAL HISTORY

Plaintiff applied for Social Security Disability Insurance benefits on December 30, 2007 (Tr. 60, 93-99), and for Supplemental Security Income benefits on January 11, 2008 (Tr. 61, 100-106). Plaintiff alleged inability to work as of March 2, 2007, due to neck and back pain as well as depression, anxiety, and panic attacks. (Tr. 115.) Social Security denied these applications. (Tr. 60-67, 70-75.) Plaintiff then requested a hearing before an ALJ, which was held on October 20, 2009. (Tr. 20-59.) The ALJ found that plaintiff was not disabled on November 20, 2009. (Tr. 4-19.) The Decision Review Board affirmed the finding on February 23, 2010. (Tr. 1-3.)

## III. BACKGROUND

As plaintiff only challenges the ALJ's decision based on her mental health issues, the review of the facts focuses only on her mental impairments.

Roberts is a twenty-six year old single female. (Tr. 93.) She has a 12th grade education, and has been employed as a grocery cashier, medical office assistant, and labeler for a medical device manufacturer. (Tr. 25, 116, 120.) She has a three-year-old son. (Tr. 122-123.)

### A.    Treating Providers

In July 2001, Roberts was seen by Jeannine Audet, M.D. at

The Center for Children & Families at Saint Anne's Hospital, due to concern by Roberts' parents regarding her academic difficulties. (Tr. 569-577.) These concerns related to Roberts' organizational skills and inability to focus on her schoolwork (Tr. 570.) Her cognitive abilities were deemed to fall in the low-average to slow-learner range, and she was diagnosed with a central auditory and processing disorder (Tr. 571, 576.) Dr Audet diagnosed Roberts with dysthymia[1], and recommended her to special needs services. (Tr. 576-577.) She prescribed Prozac for Roberts' depression.

In January 2003, Roberts was seen for anger and a "tumultuous" relationship with her boyfriend, as well as possible symptoms of an eating disorder. (Tr. 167-173.) The clinician Lorraine Stewart diagnosed her with a possible mood disorder and depression, and recommended personal and family counseling, as well as depression medication. (Tr. 172.) Roberts was assigned a Global Assessment of Functioning ("GAF") score of 55. (Tr. 172.) She was discharged from this treatment in June 2003, diagnosed with eating disorder NOS and dysthymia disorder; her GAF remained 55.[2] (Tr. 174.) Roberts did not consistently take medication or attend medical appointments. (Tr. 173.)

---

[1] Dysthymia is a mild form of chronic depression. See DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 376-381 (4th ed. 2000)("DSM IV").

[2] A GAF score between 51-60 indicates moderate symptoms. DSM IV at 32.

Five years later, on February 2, 2008, after applying for disability benefits the previous December, Roberts filled out a function report. She indicated that she takes care of her son and "neat[s] up the house" for her parents but does not engage in other substantial activities during the day. (Tr. 122-23.) She reported rarely leaving the house and that she has lost friends. (Tr. 127.) She can, however, take care of herself. She requires no reminders for personal care needs, prepares meals, and can drive, go out alone, shop, and manage personal finances. (Tr. 124-25.) She also reported, in conflict somewhat with her other reports that she engages in hobbies, socializes daily, and has little problem getting along with friends, family, and authority figures. (Tr. 126-28.)

From May 30, 2008 through July 2009, Roberts was seen by Ms. Sarah Birmingham, M.A. with Arbour Counseling Services. (Tr. 475-528, 535-42.) Roberts complained of "severe depression, constant worry, negative self image, low self esteem, relational problems, anger" and "jealousy issues." (Tr. 475.) Birmingham noted that Roberts had relational problems with anger and jealousy issues. (Tr. 475.) She also noted that Roberts required "special classes due to [an] auditory processing problem." (Tr. 475.) Ms. Birmingham concluded that Roberts had poor insight, judgment, concentration, and ability to abstract, as well as excessive appetite and low energy, but had average intelligence and

impulsivity. (Tr. 481.)  Birmingham diagnosed Roberts with major depression without psychotic features, and assigned her a GAF score of 41. (Id.)

In June 2008, Roberts was evaluated for medication by a nurse practioner, Ms. Danielle Zito-Federov, A.P.R.N., B.C.. (Tr. 489-492.)  Roberts complained of feelings of depression and anxiety, but stated that she felt calm about half of the time, that she tried to stay busy, and that the counseling was working. (Tr. 489.)  Roberts also noted that, despite being easily distracted, she was able to "usually get everything done."  (Tr. 489.)  Ms. Zito-Federov diagnosed Roberts with a mood disorder and generalized anxiety disorder, and assigned a GAF score of 35. (Tr. 492.) Plaintiff's compliance with a medication regimen was impeded by side effects and fear of taking medications. (Tr. 503, 309, 516, 538.) Subsequent notes from Ms. Zito-Federov indicate a mild improvement in Roberts' symptoms from June 2008 to May 2009. (Tr. 498, 503, 507, 509, 516, 538.)

On April 19, 2009, Roberts was evaluated by Dr. Robert DuWors, Ph.D., a specialist in clinical psychology and neuropsychology (Tr. 578-585.)  Dr. DuWors administered an intelligence test, finding Roberts' intelligence to be in the low-average to borderline impaired range. (Tr. 579.)  Dr. DuWors concluded that Roberts suffered from borderline intellectual functioning, major depression, intermittent dysthymia, fine and

gross motor impairment, higher ordered right hemisphere dysfunction, central auditory processing deficit (by report), interpersonal difficulties, and significant impairment in adaptive living, and assigned Roberts a GAF score of 50. (Tr. 584.) He then recommended that Roberts continue individual therapy, continue pharmacotherapy, and obtain Social Security Disability. (Tr. 585.) Dr. DuWors pointed out, however, that Roberts claimed "many more psychological symptoms than most patients do." This suggested the possibility that she may have been "exaggerating her symptoms in order to gain attention or services." Dr. DuWors explained that "sometimes an individual involved in litigation will produce this exaggerated clinical scale profile," and therefore, that Roberts' "clinical pattern should be interpreted with caution." (Tr. 582.)

On May 13, 2009, Ms. Birmingham wrote a letter which opined that Roberts' symptoms of major Depressive Disorder, generalized anxiety disorder and post-traumatic stress disorder, lack of concentration and memory, and auditory processing disability, make her "unable to engage in any type of full-time employment at this time or in the near future." (Tr. 528.) Ms. Birmingham then completed a medical source questionnaire in July 2009, stating that Roberts suffers from marked or extreme restriction in all areas of functioning. (Tr. 543.) Specifically, Ms. Birmingham reported that plaintiff was extremely impaired in her

ability to maintain concentration for extended periods of time or to understand or remember complex instructions; overall Roberts' exhibited extreme difficulty maintaining concentration, persistence, or pace. (Tr. 543, 545).

## B.   Non-Treating Sources

In March 2008, Rober Cserr, M.D. performed a consultative psychiatric examination on the plaintiff. (Tr. 292-95.) According to Dr. Cserr's report, Roberts complained of anxiety occurring over the past five years, but stated she was able to take care of herself and perform basic activities of daily living. (Tr. 292.)  Though she had difficulty with some mental calculations, Roberts was cooperative and able to express herself clearly and coherently, with no flight of ideas or tangentiality. (Tr. 292-293.)  She told Dr. Cserr that she had terminated treatment for her anxiety and depression and stopped taking her medication because of unpleasant side effects. (Tr. 294.)  Dr. Cserr found that Roberts' memory and judgment were intact and that she was fully oriented. (Tr. 293.)  He diagnosed her with panic disorder without agoraphobia, dysthymic disorder, and personality disorder NOS, depressive type, with dependent features and assigned a GAF score of 58.  (Tr. 294.)

On March 31, 2008, Dr. S. Fischer, Psy. D., a state agency psychologist, reviewed Roberts' file to assess Roberts' mental impairments.  (Tr. 311-313.)  Dr. Fischer found moderate

limitations in Roberts' abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances. He also noted that she was moderately limited in her abilities to "complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." But Dr. Fischer did not find any other significant limitations. (Tr. 311-312.) He ultimately determined that Roberts did not have any mental impairments and noted that she "can carry out simple instructions in a normal workday/workweek." (Tr. 313.)

In July 2008, Dr. Ronald Nappi, Ed. D., another state psychologist, reviewed Roberts' file. (Tr. 351-354.) But he apparently did not have access to Ms. Birmingham's notes from Arbour. Dr. Nappi found moderate limitations in Roberts' abilities to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically-based symptoms; (4) perform at a consistent pace without an unreasonable number and length of rest periods; (5) accept instructions; (6) respond appropriately to criticism from supervisors; and (7) respond appropriately to changes in the work

setting. (Tr. 351-352.)  Dr. Nappi concluded that Roberts was
"able to focus attention and maintain concentration for simple
tasks for two hour periods in the course of the normal 8-hour
workday" and was "able to interact appropriately with the general
public," but "would work best in a position that has clear,
established norms." (Tr. 353.) He reported a primary diagnosis of
dysthymia, and secondary diagnosis of anxiety. (Tr. 353.)  Dr.
Nappi also noted that Roberts exhibited signs of a learning
disability, but had "learned to compensate" for it.  (Tr. 353.)

## C. Hearing and ALJ Opinion

The hearing in this matter took place on October 20, 2009
before the Administrative Law Judge (ALJ).  Two witnesses
testified.  The first was the plaintiff, who testified at length
about her impairments and her activities of daily living. (Tr.
23-53.) Then a vocational expert testified about the plaintiff's
ability to perform work. (Tr. 54-59.)

In considering the plaintiff's conditions, the ALJ found
that the plaintiff had the following severe impairments: cervical
spine degenerative disc disease, borderline cognitive functioning
and intermittent depression/dysthemia. (Tr. 9.)  These
impairments caused significant limitations in the claimant's
ability to perform basic work activities. (Tr. 10.)  The
plaintiff also alleged lower back pain, vertigo, headaches, knee
pain, and abdominal pain.  However, the ALJ determined that the

record of objective medical evidence and history of plaintiff's complaints to medical professionals failed to establish that these issues imposed more than minimal impairments on the claimant's ability to engage in basic work related activities. (Tr. 10.) At the next step in the analysis, the ALJ found that the plaintiff's severe impairments were not so severe as to preclude substantial gainful employment. (Tr. 10-11.)

The ALJ then determined that the plaintiff had a residual functional capacity to perform less than the full range of light work, see 20 C.F.R. 404.1567(b), 416.967(b), and that she had "moderate non-exertional limitations in maintaining attention and concentration, and in dealing appropriately with the public, co-workers, and supervisors." (Tr. 11.) The plaintiff alleged that she could not work because of "neck pain, panic attacks, an inability to be around people, and anxiety." (Tr. 12.) She reported that she was able to do a little housework, care for her young child, exercise, and drive an automobile, but that she was otherwise limited in her activities of daily living. (Id.) The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause some symptoms of the type alleged, but that [her] statements concerning the intensity persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the ALJ's RFC finding.

Regarding the plaintiff's mental condition, the ALJ engaged in an extensive discussion of the plaintiff's history of mental evaluations. These evaluations revealed a history of depression and eating disorders. (Tr. 14-15.) Many of the evaluations reported mild to moderate impairments, but in May 2009, Ms. Birmingham reported that the plaintiff had a major depressive disorder, a generalized anxiety disorder, and a post-traumatic stress disorder. (Tr. 15. ) Further, Ms. Birmingham wrote that "due to the severity of [the plaintiff's] physical and mental symptoms she is unable to engage in any type of full time employment at this time or in the near future." (Tr. 16.)

The ALJ found that the claimant's treatment history, activities of daily living, and lack of credibility, belied the suggestion that her mental disabilities prevented her from finding gainful employment. The ALJ noted that the plaintiff was non-compliant with her medications, and that when she was compliant she reported that the medication was helpful and her mood was improved. (Tr. 15. ) Moreover, the plaintiff engaged in fairly significant activities of daily living, including caring for her child, and exercising twice a week. (Tr. 16.) Finally, the ALJ found the plaintiff's testimony not credible. Despite her contention that she was unable to work, she collected unemployment benefits from 2007-2009. (Id.).

The ALJ also found Ms. Birmingham's opinion regarding the plaintiff's considerable limitations to be inconsistent with the record as a whole. Specifically, the ALJ placed more weight on the opinion of the non-examining state agency consultant, Dr. Nappi who found that the claimant was "able to focus attention and maintain concentration for simple tasks for 2 hour periods of time in the course of a normal 8 hour workday. . . [,] able to interact appropriately with the general public. . . [,] and that she would work best in a job with a clear, established routine." (Tr. 16.) The ALJ concluded: "In summary the above residual functional capacity assessment is supported by the diagnostic testing, clinical examinations and signs of record, her treatment history, the claimant's activities of daily living, her inconsistent statements, and the opinion evidence of the State psychological consultant at the reconsideration level." (Tr. 17.)

Finally, the ALJ determined that the plaintiff was capable of performing past relevant work as a labeler. (Tr. 17.) At the hearing, the vocational expert characterized this job as light exertional and unskilled, which was consistent with the ALJ's RFC. (Id.) In the alternative, the ALJ also found that there were significant other jobs available in the national economy that the plaintiff could also perform. (Id.) It was the vocational expert's opinion that the plaintiff would be able to perform 472,900 jobs in the hand packer/inspector category in the

national economy, 915,890 jobs in housekeeping, and 288,480 jobs as an electronic worker. (Tr. 18.)

## IV. STANDARD OF REVIEW

For an individual to obtain Social Security disability benefits, that individual must demonstrate inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An impairment can only be disabling if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3).

The Commissioner has developed a five-step sequential evaluation process to determine whether a person is disabled. See 20 C.F.R. § 404.1520(a)(4); see also Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982). "Step one determines whether the plaintiff is engaged in 'substantial gainful activity.' If the plaintiff is, disability benefits are denied. If the plaintiff is not, the decisionmaker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments." Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (internal citations omitted). To establish a severe impairment the claimant must

"show that [the claimant] has an 'impairment or combination of impairments which significantly limits . . . the abilities and aptitudes necessary to do most jobs.'" _Id._ at 146 (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)).

If the claimant has a severe impairment, the third step is to determine "whether the impairment is equivalent to one of a number of listed impairments that . . . are so severe as to preclude substantial gainful activity." _Id._ at 141 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). If so, the claimant is conclusively presumed to be disabled. _Id._ If not, the fourth step evaluates whether the impairment prevents the claimant from performing his or her past work. _Id._ A claimant is not disabled if that claimant is able to perform his or her past work. _Id._ (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)). If a claimant cannot perform his or her past work, the burden shifts to the Commissioner on the fifth step to prove that the claimant "is able to perform other work in the national economy in view of [the claimant's] age, education, and work experience." _Id._ at 142, 146 n.5. During steps one, two, and four, the burden of proof is on the claimant. _Id._ at 146, n.5. At the fifth step, the burden is on the Commissioner. _Id._ at 142. If the Commissioner fails to meet this burden, the claimant is entitled to benefits. _Id._

In reviewing disability and disability insurance decisions

made by the Commissioner, a Court does not make de novo determinations.  Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).  Rather, a Court "must affirm the [ALJ's] findings if they are supported by substantial evidence." Cashman v. Shalala, 817 F. Supp. 217, 220 (D. Mass. 1993); see also Rodriquez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (stating that the ALJ's determination must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").

Substantial evidence is "more than a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  It is such relevant evidence as a "reasonable mind, reviewing the evidence in the record as a whole, could accept . . . as adequate to support [the ALJ's] conclusion."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  In reviewing the record for substantial evidence, a court is "to keep in mind that '[i]ssues of credibility and the drawing of permissible inferences from evidentiary facts are the prime responsibility of the [ALJ].'" Rodriquez, 647 F.2d at 222 (quoting Rodriquez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965)).  When a conflict exists in the

record, the ALJ bears the duty to weigh the evidence and resolve material conflicts in testimony. See Richardson, 402 U.S. at 399; see also Irlanda Ortiz, 955 F.2d at 769.

In addition to considering whether the ALJ's decision was supported by substantial evidence, a court must consider whether the proper legal standard was applied. "Failure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal." Weiler v. Shalala, 922 F. Supp. 689, 694 (D. Mass. 1996) (citing Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982)).

## V. DISCUSSION

### A. Ms. Birmingham's Opinion

Plaintiff's primary argument is that the ALJ did not properly consider the opinions of Ms. Sarah Birmingham, plaintiff's counselor at Arbour.

According to federal regulations, in order to establish the existence of a medically determinable impairment, evidence is required from an acceptable medical source. 20 C.F.R. § 404.1513(a). "Acceptable" medical sources include licensed physicians, and licensed or certified psychiatrists. 20 C.F.R. § 404.1527, 416.927. However, federal regulations do not preclude consideration of the opinions of other medical sources, like

nurse practitioners and licensed clinical social workers. <u>See</u> 20
C.F.R. §§ 416.913(d); 416.929(c)(3).  In fact, according to
Social Security Ruling 06-3, the opinions of treating non-
acceptable medical sources are useful "to show the severity of
the individual's impairment(s) and how it affects the
individual's ability to function." <u>Id.</u>  The ruling acknowledges
that "it may be appropriate to give more weight to the opinion of
a medical source who is not an 'acceptable medical source' if he
or she has seen the individual more often than the treating
source and has provided better supporting evidence and a better
explanation for his or her opinion." <u>Id</u>.

       In line with Social Security Administration policy, the ALJ
considered Ms. Birmingham's opinion notwithstanding the fact that
she is not an acceptable medical source.  He ultimately disagreed
with the opinion, despite Ms. Birmingham's extensive contact with
the plaintiff, because he found it inconsistent with the weight
of the record evidence.  According to the ALJ, the evidence
suggested that the plaintiff was able to perform tasks of daily
living, like exercising, taking care of her son, singing,
shopping and socializing.  The ALJ also pointed out that
plaintiff responded positively to treatment, including
psychiatric medication, on occasions when she did comply. (Tr.
15.)  Further, the plaintiff stopped work as a label tech in a
medical device firm because she was pregnant, and "constantly

sick", not because of disability. (Tr. 29). Finally, the ALJ found that plaintiff received unemployment benefits as late as August 2009, indicating that she was "ready and able to work." (Tr. 16).

The record evidence on this question is mixed. There is certainly evidence in the record that a fact-finder could rely upon in accepting Ms. Birmingham's position. Most significantly, Dr. DuWors, an acceptable medical source, performed a series of tests on the plaintiff and determined that she was seriously impaired, and could be diagnosed with "borderline intellectual functioning; major depression, intermittent; and dysthymia." (Tr. 15.) He also assigned the plaintiff a GAF score of 50, which indicates a serious impairment, but is only one point shy of a score showing moderate limitations. However, he also cautioned that she could be exaggerating her symptoms because of the disability litigation.

On the other side of the ledger, is the opinion of Dr. Nappi, the State consultant, who relied on the March 2008 report of Dr. Robert Cserr, a non-treating acceptable source who determined that the plaintiff had only moderate limitations. (Tr. 351-353.) Plaintiff points out that neither Nappi nor Cserr reviewed the subsequent records from Arbour or the neurological exam by Dr. DuWors. However, there is other evidence in the record that corroborates their views. For example, although Dr. DuWors determined as late as 2009 that the plaintiff was

seriously impaired, the ALJ noted that the record also contained evidence from that same year that the plaintiff's mood improved when she actually complied with her treatment plan, including medication.  Furthermore, even Dr. DuWors observed the possibility that the plaintiff was exaggerating her symptoms for the purposes of receiving benefits.  Finally, the ALJ relied on the plaintiff's own testimony, which revealed that she was able to perform a number of tasks of daily living.  Though another ALJ may have given more weight to Ms. Birmingham's opinion, the heavy weight of evidence suggesting that the plaintiff is not disabled provided the ALJ with substantial reasons to arrive at a different conclusion from the treating therapist.  Cashman, 817 F. Supp. at 220; see also DaCosta v. Apfel, 81 F. Supp. 2d 235, 241 (D. Mass. 2000) ("The findings of the Commissioner are conclusive if supported by substantial evidence and should be upheld even in those cases in which the reviewing court, had it heard the same evidence de novo, might have found otherwise." (internal citation omitted)).  For these same reasons, the ALJ's RFC finding was also proper. See 20 CFR § 404.154(a)(1)("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

**B. ALJ's Credibility Assessment**

Plaintiff also intimates that the ALJ's credibility assessment was flawed for considering that plaintiff collects unemployment benefits.

As a matter of law, this argument is unfounded. In making a credibility assessment, an ALJ is permitted to consider a number of different factors in determining whether a claimant is credible. See Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) ("The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings."). Furthermore, though Social Security Administration policy suggests that the receipt of unemployment insurance benefits does not preclude the receipt of disability benefits, it also notes that "application for unemployment benefits is evidence that the ALJ must consider together with all of the medical and other evidence." See Pl's Mem. Appendix B [Docket No. 16-2].

Furthermore, on the record here, the ALJ's credibility finding was appropriate. The ALJ's discussion with the plaintiff about her application for unemployment benefits explained that an application for unemployment benefits is significant to the extent that it suggests that the plaintiff is willing and able to work. (Tr. at 28.) Furthermore the record also contains Dr. DuWors' April 2009 opinion, in which he stated that the plaintiff may have been exaggerating her symptoms. In assessing credibility, the ALJ considered this as well as plaintiff's daily activities, plaintiff's statements throughout the record, and the

fact that plaintiff's symptoms improve with medication.  The
ALJ's finding was supported by substantial evidence, and
consideration of plaintiff's unemployment benefits in this
context was not improper.

## VI. ORDER

Defendant's Motion for an Order Affirming the Decision of
the Commissioner [Docket No. 17] is **ALLOWED**.


/S/ PATTI B. SARIS
Patti B. Saris
United States District Judge